UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT HUNT,                          )
                                      )
            Plaintiff,                )
                                      )
       v.                             )        No. 10 C 2874
                                      )
MICHAEL J. ASTRUE, Commissioner of    )
Social Security,                      )
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff, Robert E. Hunt ("Hunt"), seeks judicial review of a final decision denying his

claim for Supplemental Security Income ("SSI") disability insurance benefits under Title XVI of

the Social Security Act. Hunt has filed a Motion for Summary Judgement (Dkt. No. 25) and

seeks a judgement reversing or remanding the final decision of the Commissioner of Social

Security ("Commissioner"). The Commissioner also filed a Motion for Summary Judgement

(Dkt. No. 34) seeking to have the Commissioner's final decision affirmed. For the reasons set

forth below, Hunt's motion is denied, the Commissioner's motion is granted, and the

Commissioner's final decision is affirmed.

### PROCEDURAL HISTORY

On October 30, 2007, Hunt filed a Title II application for a period of disability and

disability insurance benefits, alleging a disability that began January 9, 2007. (9/8/2009 ALJ

Decision; R. at 10.)[1]  Hunt's claim was first denied by the Social Security Administration on February 13, 2008, and was denied upon reconsideration on July 9, 2008.  (*Id.*)  On July 17, 2008, Hunt filed a written request for a hearing in front of an administrative law judge ("ALJ") pursuant to 20 C.F.R. § 404.929.  (*Id.*)

On March 31, 2009, a hearing was held in front of ALJ Shirley Moscow Michaelson.  (*Id.*)  ALJ Michaelson heard testimony from Hunt, who was represented by attorney Agustin G. Garcia during the proceedings.  (*Id.*)  ALJ Michaelson also heard testimony from impartial medical expert Walter J. Miller Jr., MD ("ME") and from impartial vocational expert Lee O. Knutson ("VE").  (*Id.*)  On September 8, 2009, ALJ Michaelson ruled that Hunt was not entitled to SSI disability insurance benefits because he was not disabled according to the guidelines found in sections 216(I) and 223(d) of the Social Security Act.   (9/8/2009 ALJ Decision; R. at 10-21.)

Hunt filed a request for review of ALJ Michaelson's September 8, 2009 ruling with the Social Security Administration's Appeals Council, and his request was denied on March 12, 2010.  (3/12/2010 Order; R. at 1.)  Accordingly, the prior ruling by ALJ Michaelson became the Commissioner's final decision.  (*Id.*)  On May 10, 2010, Hunt filed a complaint in this court seeking judicial review of the Commissioner's final decision.  (Dkt. Nos. 1, 9.)

<u>STATEMENT OF FACTS</u>

Hunt was born August 6, 1958.  Hunt is a high school graduate and also has some college

---

[1] The parties do not dispute the material facts set forth in the certified administrative record filed with this court.  (Dkt. No. 11 ("R. at __").)  Accordingly, the court relies on the certified administrative record for purposes of setting forth all facts material to the pending motions.

education, although he did not earn a college degree. Hunt was last employed by DHL, where he drove a delivery route and also routinely assisted in unloading air cargo containers weighing up to twelve-hundred pounds. Hunt has previous experience working as a printing press operator.

On January 9, 2007, while making deliveries, Hunt fell down a flight of stairs and "flipped over head over heels" landing on his left shoulder. (3/31/2009 Hr'g Tr. (Hunt); R. at 39.) As a result of the fall, Hunt began experiencing significant pain in his left shoulder. The left shoulder injury was first diagnosed on January 9, 2007, as a strain by a company doctor. On February 8, 2007, Hunt's treating physician, Daniel C. Newman, MD ("Dr. Newman"), diagnosed Hunt as having suffered inflammation and an injury to the rotator cuff of his left shoulder, as well as tenderness "over the os acromiale defect." (2/8/2007 Newman File Letter; R. at 203.) Dr. Newman recommended physical therapy at that time. Two months later, after physical therapy and work conditioning failed to alleviate Hunt's shoulder pain, Dr. Newman recommended surgery as the next course of treatment. (4/17/2007 Newman File Letter; R. at 198.)

Hunt had two surgeries performed on his left shoulder: one on April 27, 2007 and another on July 6, 2007. After the second surgery, Hunt again participated in physical therapy until the end of October, 2007. Hunt terminated physical therapy on the recommendation of his physical therapist that there was nothing more that could be done for Hunt in that setting. (3/31/2009 Hr'g Tr. (Hunt); R. at 43.) On October 16, 2007, Dr. Newman recommended conducting a Functional Capacity Evaluation ("FCE") of Hunt's left shoulder. (10/16/2007 Newman File Letter; R. at 189.) Hunt filed his initial application for Social Security disability benefits on October 30, 2007.

After reviewing Hunt's FCE on November 13, 2007, Dr. Newman noted "some inconsistences" that resulted from Hunt's refusal to perform certain components of the evaluation

out of fear of re-injuring his left shoulder. (11/13/2007 Newman File Letter; R. at 188.) Specifically, Hunt refused to attempt to lift thirty pounds with his left arm. (*Id.*) Dr. Newman concluded that the results of the FCE were not "entirely valid," and opined that Hunt "is able to lift more [than 30 pounds] with double lift but not with the single arm." (*Id.*) Also on November 13, 2007, Dr. Newman determined that Hunt's left shoulder had reached its maximum medical improvement ("MMI") and he recommended that Hunt's previous restrictions—which Dr. Newman found to be "consistent with the recommendations of the Functional Capacity Evaluation"—become permanent. (*Id.*) These restrictions limited Hunt to performing only "light duty" work. (9/18/2007 Newman File Letter; R. at 191; 3/15/2007 Newman File Letter; R. at 200.)

On February 4, 2008, state disability examiner Vidya Madala, MD ("Dr. Madala") performed a residual functional capacity assessment of Hunt. Dr. Madala opined that Hunt could frequently lift ten pounds, could occasionally lift twenty pounds, and could occasionally reach overhead with his left arm. (2/4/2008 Madala Report; R. at 236, 238.) Hunt returned to his previous employment with DHL on April 2, 2008, but only worked for two days before he was advised by a company doctor to return to light duty. Dr. Newman likewise advised Hunt "to go back to work with the previously outlined restrictions and see how he tolerates it." (4/8/2008 Newman File Letter; R. at 210.)

On December 8, 2008, Hunt was involved in a rollover car accident which increased the pain in Hunt's left shoulder. After examining Hunt on January 6, 2009, Dr. Newman found no new significant injury to Hunt's left shoulder. (1/6/2009 Newman Clinic Note; R. at 266.) Dr. Newman recommended that Hunt renew his anti-inflammatory medication and physical therapy.

(*Id.*)  Hunt did not pursue this course of treatment, however, because he did not have health insurance to cover the expenses.  (3/31/2009 Hr'g Tr. (Hunt); R. at 49.)

A.    Testimony at the March 31, 2009 Hearing

At the March 31, 2009 hearing, Hunt described the pain he experienced from January 2007 through November 2007 as a "shooting pain from my elbow up to my shoulder" and, on days it rained, as a constant pain rated as a five on a scale of one to ten.  (3/31/2009 Ht'g Tr. (Hunt); R. at 45.)  Dr. Newman initially prescribed Vicodin for Hunt's pain control, but Hunt discontinued its use after "about a week or a week-and-a-half" due to unspecified side effects.  (*Id.*)  At the time of the March 31, 2009 hearing, the only pain medication that Hunt relied upon was over-the-counter Aleve.

Hunt lives with nine other members of his family and is primarily in charge of driving his kids to school, although at times he experiences a "shooting pain" and "will have to stop when I'm doing and pull over."  (3/31/2009 Hr'g Tr. (Hunt); R. at 51-53.)  Hunt also shops, cooks, and washes dishes for his family.  Hunt has no restrictions on how much he can stand or walk, and he testified at the March 31, 2009 hearing that "currently right now I could probably [lift] 30 pounds max with either hand."  (3/31/2009 Hr'g Tr. (Hunt); R. at 44.)  Hunt further testified that "after about fifteen minutes or so of repetitive motion I have to take a break," and he noted that "three to four times a day" he experienced a strong ache lasting as long as fifteen minutes.  (3/31/2009 Hr'g Tr. (Hunt); R. at 54, 65.)  Hunt also testified that, due to his injury to his left shoulder, he tended to favor his right shoulder.  (3/31/2009 Hr'g Tr. (Hunt); R. at 57.)  In Hunt's estimate, because his right shoulder has been overworked, it now operates at only eighty to ninety percent of normal.  (*Id.*)  Finally, Hunt also noted problems with concentration and an inability to make a

firm grip or write well with his dominant left hand.  (3/31/2009 Hr'g Tr. (Hunt); R. at 55-56, 58-61.)

The ALJ heard testimony from the ME at the March 31, 2009 hearing, who testified via telephone.  The ME explained Hunt's condition as "a guy who had left shoulder pain who developed capsulitis,[2] and who had surgery for it, but who probably got the capsulitis back." (3/31/2009 Hr'g Tr. (ME); R. at 66.)  The ME also noted that the "mildly positive" impingement currently suffered by Hunt in his left shoulder could "affect the motion of the arm," even though "there is no nerve damage done . . . [and] the reflexes, and the arm motion, and the size of the muscles and everything are normal."  (3/31/2009 Hr'g Tr. (ME); R. at 79-80.)  The ME testified that Hunt could stand for "six hours easily" and that he could lift twenty pounds occasionally and ten pounds frequently with his non-dominant hand.  (3/31/2009 Hr'g Tr. (ME); R. at 68.)  In the ME's opinion, Hunt could do close-up work using his left wrist and elbow, but he would not be able to perform any frequent extended reaching or overhead lifting with his left arm.  (3/31/2009 Hr'g Tr. (ME); R. at 69-70.)  The ME also agreed with ALJ Michaelson that Hunt could not perform any duties that required crawling.  The ME declined to comment on Hunt's complaints regarding his left hand, noting "there is nothing in the record anywhere about it."  (3/31/2009 Hr'g Tr. (ME); R. at 67-68.)

At the March 31, 2009 hearing, the VE testified as to the number of jobs that were available in the Chicago primary metropolitan area for an individual with Hunt's restrictions and past relevant work history.  The VE opined that there were 8,000 available information clerk

---

[2] The term "adhesive capsulitis" refers to a condition known as "frozen shoulder"—"a shoulder affected by severe pain, stiffness, and restricted motion."  Merriam-Webster, MedlinePlus, http://merriam-webster.com/medlineplus (last visited Mar. 22, 2012).

positions, 4,000 available parking lot attendants positions, and 500 available usher positions, all of which could be classified as "light." (3/31/2009 Hr'g Tr. (VE); R. at 74-76, 81-82.) Although the official *Dictionary of Occupational Titles's* ("DOT") description of the "light" information clerk position calls for "frequent reaching," the VE disagreed with this requirement based on his own observations and opined that the position actually required only occasional use of the hands. (3/31/2009 Hr'g Tr. (VE); R. at 77-78, 83-86.) At the "sedentary" level, the VE testified that there were 1,700 available information clerk positions and 1,800 available surveillance system monitor positions. (3/31/2009 Hrg' Tr. (VE); R. at 77-78.) The VE also opined that an individual who was "off task" for fifteen minutes each hour "would not be able to sustain employment." (3/31/2009 Hr'g Tr. (VE); R. at 79.) Finally, although Hunt's counsel argued that the VE erred by using data assembled in 2007, the VE testified that the numbers "should fit" with the 2009 economy. (3/31/2009 Hr'g Tr. (VE); R. at 86-87.)

B.    Additional Evidence Considered by ALJ Michaelson

On April 20, 2009, consistent with ALJ Michaelson's direction, Hunt was examined by M. S. Patil, MD ("Dr. Patil"). In his assessment, Dr. Patil noted that Hunt had a reduced range of motion in his knees and shoulders, but ultimately determined that Hunt could lift and carry between twenty-one and fifty pounds "frequently," e.g. "from one-third to two-thirds" of the work day. (4/20/2009 Patil Report; R. at 253, 255.) Dr. Patil noted no difficulties in Hunt's use of either hand for purposes of fine and gross manipulative movements, and concluded that Hunt was capable of "frequent" use of both hands for all types of reaching—including overhead reaching—and for handling, fingering, feeling, and pushing/pulling. (4/20/2009 Patil Report; R. at 253, 257.) Dr. Patil also determined that Hunt could sit for four hours without interruption, and

that he could stand and walk for three hours without interruption.  (4/20/2009 Patil Report; R. at 256.)  Dr. Patil deemed Hunt capable of standing, sitting, and walking for a total of six hours a day in each capacity.  (*Id.*)

C.     ALJ Michaelson's September 8, 2009 Decision

    In reaching her September 8, 2009 disability determination, ALJ Michaelson employed the procedure set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a).  Under this analysis, an ALJ must engage in a five-step inquiry, asking: "1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments . . . that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience."  *Young v. Secretary of Health & Human Servs.,* 957 F.2d 386, 389 (7th Cir. 1992).  "A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step.  An affirmative answer at steps three or five results in a finding of disability."  (*Id.*)

    ALJ  Michaelson first determined that Hunt was currently not engaged in any substantial gainful activity, and that he did have a severe impairment due to residual limitations following the surgical repair of his dominant left shoulder, thus satisfying the first and second requirements of 20 C.F.R. § 404.1520(a).  (9/8/2009 ALJ Decision; R. at 12.)  ALJ Michaelson also found that Hunt's impairment did not meet or exceed any of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("Listing of Impairments" or "Listing") for purposes of satisfying the third requirement of 20 C.F.R. § 404.1520(a). (9/8/2009 ALJ Decision; R. at 12-13.) Specifically, ALJ Michaelson determined that Hunt's shoulder impairment "does not meet or medically equal the requirements of Listing 1.02 [Major dysfunction of a joint]." (*Id.*) ALJ Michaelson next determined Hunt's residual functional capacity ("RFC"), which she described as follows:

> . . . the claimant can lift up to 10 pounds frequently and up to 20 pounds occasionally using both arms. The claimant has no standing, walking or sitting limitations [footnote omitted]. Due to his objectively verified shoulder limitations, the claimant can never crawl or reach overhead with his left upper extremity. He can only occasionally reach with his dominant left arm in any direction, though he can frequently work with his left arm directly in front of him for close-in work. He can use his dominant left arm to help his right upper extremity, which has no limitations.

(9/8/2009 ALJ Decision; R. at 18.) As part of this analysis, ALJ Michaelson concluded that Hunt was able to perform "light work" as defined in 20 C.F.R. § 404.1567(b). (9/8/2009 ALJ Decision; R. at 13.) Relying on this RFC, ALJ Michaelson determined that Hunt was unable to perform any past relevant work, thereby satisfying the fourth requirement of 20 C.F.R. § 404.1520(a). (9/8/2009 ALJ Decision; R. at 19.) Finally, ALJ Michaelson concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (9/8/2009 ALJ Decision; R. at 20.) ALJ Michaelson ultimately held that Hunt "has not been under a disability, as defined in the Social Security Act, from January 9, 2007 through [September 8, 2009]" and therefore was not entitled to the disability insurance benefits that he was seeking. (9/8/2009 ALJ Decision; R. at 20-21.)

In reaching her September 8, 2009 decision, ALJ Michaelson considered many portions of the available record, including Hunt's testimony at the March 31, 2009 hearing, Dr. Newman's

various reports and recommendations, Dr. Madala's February 4, 2008 report, Dr. Patil's April 20, 2009 report, and the March 31, 2009 testimony of both the ME and the VE. (9/8/2009 ALJ Decision; R. at 13-20.) ALJ Michaelson gave the ME's opinion testimony "very significant weight" in determining Hunt's RFC, noting that the ME's testimony "is very well supported by the medical evidence of record" and "adequately considered the claimant's subjective complaints as well." (9/8/2009 ALJ Decision; R. at 17.) ALJ Michaelson also relied on Hunt's testimony that he was able to care for his personal needs, including shopping, cooking, dishwashing, and using utensils; that he could lift up to 30 pounds; that he regularly drove a car; and that the only pain medication he currently relied on was over-the-courter Aleve. (9/8/2009 ALJ Decision; R. at 13-14, 16.) ALJ Michaelson considered Dr. Newman's recommendations for light duty work to be "consistent with" her RFC determination, and she also accorded "full weight" to Dr. Patil's "objective findings" regarding Hunt's functional capabilities. (9/8/2009 ALJ Decision; R. at 16.) On the other hand, ALJ Michaelson gave "no weight" to Dr. Patil's assessment that Hunt was able to perform work "at the medium level," finding this assessment to be "inconsistent with [Dr. Patil's] own objective diagnostic findings, as well as the medical record in its entirety." (9/8/2009 ALJ Decision; R. at 17.) ALJ Michaelson also gave "no weight" to Dr. Patil's assessment that Hunt could "frequently climb and crawl . . . since both activities require significant shoulder use and strength." (9/8/2009 ALJ Decision; R. at 18.) Similarly, ALJ Michaelson gave "limited weight" to an April 2008 work status discharge sheet stating that Hunt was unable to lift more than 5 pounds with his left hand, noting "there is little support in this treating source statement for a finding that the claimant is prevented from working within the assessed residual functional capacity, which incorporates the claimant's ability to lift using both

hands together and is supported by the claimant's own testimony." (*Id.*) Finally, ALJ Michaelson found Hunt's statements regarding the intensity, persistence and limiting effects of his impairment to be "not credible to the extent they are inconsistent with" her RFC determination. (9/8/2009 ALJ Decision; R. at 15.)

With respect to Hunt's ability to perform other jobs existing in significant numbers in the national economy, ALJ Michaelson accepted the VE's opinion testimony regarding the number of jobs available in the Chicago metropolitan area and found "that these numbers represent a significant number of jobs in the regional economy, and by extension, the national economy." (9/8/2009 ALJ Decision; R. at 20.) ALJ Michaelson also acknowledged the discrepancy between the DOT's definition of the "light duty" information clerk position and the VE's opinion that this position did not require frequent reaching, emphasizing that the VE's "numerous years of professional experience" and "vocational expertise" formed the basis of his differing opinion. (*Id.*) Ultimately, ALJ Michaelson concluded that Hunt was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and a finding of 'not disabled' is appropriate." (*Id.*)

D.     Additional Evidence Submitted to the Appeals Council

Hunt also submitted to the Appeals Council records from Saint Joseph Hospital regarding treatment Hunt received in June and July 2009 for cervical degenerative disc disease and cervical spinal stenosis. (R. at 298-304.) Although the Appeals Council considered Hunt's additional evidence, the Appeals Council found that this information "does not provide a basis for changing the Administrative Law Judge's decision" and suggested instead that Hunt may have "additional severe impairments." (3/12/2010 Order; R. at 2.) As noted above, the Appeals Council denied

Hunt's request for review.

STANDARD OF REVIEW

The court performs a *de novo* review of the ALJ's legal conclusions, while giving

deference to the ALJ's factual determinations. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir.

2010). In other words, the court "will uphold the Commissioner's decision so long as the ALJ

applied the correct legal standard and substantial evidence supported the decision." *Castile v.

Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *see also* 42 U.S.C.§ 405(g). "Substantial evidence is

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Jones*, 623 F.3d at 1160 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). When

reviewing for substantial evidence, the court does not substitute its own judgment for that of the

ALJ by re-weighing evidence or making credibility determinations. *Skinner*, 478 F.3d at 841.

The court does, however, require "a 'logical bridge' between the evidence and [the ALJ's]

conclusions." *Jones*, 623 F.3d at 1160 (quoting *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir.

2008)).

ANALYSIS

Hunt has articulated numerous arguments in support of his motion for summary judgment.

The court has taken the liberty of reorganizing Hunt's arguments for ease of analysis.

I.      Substantial Weight of the Evidence

Hunt argues generally that ALJ Michaelson's September 8, 2009 disability determination

was not supported by the substantial weight of the evidence in the record. Specifically, Hunt

takes issue with ALJ Michaelson's findings that: (1) Hunt does not satisfy the requirements of

Listing 1.02; (2) Hunt's RFC is appropriately classified as "light" work; and (3) Hunt can perform other work existing in significant numbers in the national economy. The court addresses each of these arguments in turn.

A.    Listing 1.02

Hunt first argues that ALJ Michaelson disregarded clear evidence in making the determination that Hunt lacked the requisite impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. It is Hunt's contention that the os acromiale in his left shoulder and resultant adhesive capsulitis and impingement, set forth both in Dr. Newman's records and in the ME's testimony, meet the requirements of Listing 1.02. (Dkt. No. 27 ("Pl.'s Br.") at 11-12.)

Listing 1.02 describes the following impairment:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.02. Section 1.00B2c, in turn, states that the "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 CFR Pt. 404, Subpt. P, App. 1, §

1.00B2c.

Without discussing the specific language of Subpart A or B, Hunt argues that he suffered a "clear impingement into the joint space" and had "clear adhesions" in his left shoulder, leading to the "inescapable conclusion" that he satisfied the requirements of Listing 1.02. (Pl.'s Br. 11-12.) The court's analysis focuses on Subpart B of Listing 1.02, as Hunt has not claimed an inability to ambulate effectively.

ALJ Michaelson's determination that Hunt's left shoulder impairment "has not resulted in an inability to perform gross movements effectively," (9/8/2009 ALJ Decision; R. at 13), is supported by substantial evidence in the record. Simply put, as articulated by the Commissioner, "[w]hile Plaintiff has significant impairment of his left (dominant) shoulder, he does not have impairment of two major peripheral joints—one in each upper extremity, as required by the listing." (Dkt. No. 35 ("Comm'r Br.") at 4.) Hunt has not cited any evidence in the medical record suggesting that he suffered from a major dysfunction of a joint in *both* non-weight bearing extremities (i.e. his shoulders), and the court is not aware of any evidence that would support this conclusion. Accordingly, the ALJ's finding is not against the substantial evidence in the record.

Hunt also argues that if his shoulder affliction alone is not enough to satisfy the listing requirements, then his combination of impairments "meets or medically equals one of the listed impairments." (Pl.'s Br. 12.) In support of this argument, Hunt cites to evidence in the record that he suffered from hip and knee pain, as well as cervical degenerative disk disease and cervical spinal stenosis. (*Id.*) A claimant's combination of impairments can support a finding of disability at Step 3 if "the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 404.1526(b)(3). In this analysis, a

14

combination of impairments "is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). As the claimant, Hunt "bears the burden of proving his condition meets or equals a listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Hunt has not identified any listed impairment that he believes is appropriate for purposes of comparison, nor has he explained how the severity and duration of his hip, knee, and spinal impairments meets or equals any listed impairment. The court is not persuaded by this underdeveloped argument and finds no reversible error in ALJ Michaelson's conclusion that Hunt "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (9/8/2009 ALJ Decision; R. at 12.)

B.    RFC Classification

Hunt also argues that "[t]he ALJ's classifying Mr. Hunt's RFC as 'Light' is against the weight of the evidence and the clear language of 20 C.F.R. § 404.1567(a)-(b)." (Pl.'s Br. 15.) Section 404.1567(b) defines "light" work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). "Sedentary" work, on the other hand, involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).

In her September 8, 2009 decision, ALJ Michaelson found that Hunt "has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), which includes being able to lift up to 10 pounds frequently and up to 20 pounds occasionally using both arms, with no limitations on his ability to stand, walk or sit." (9/8/2009 ALJ Decision; R. at 13.) ALJ Michaelson noted further restrictions, however, to the extent that Hunt "cannot crawl or reach overhead with his left upper extremity[,] can only occasionally reach with his dominant left arm in any direction, though he can frequently work with his left arm directly in front of him for close-in work[, and] can use his dominant left arm to help his right upper extremity, which has no limitations." (*Id.*)

Hunt argues that ALJ Michaelson should have considered certain additional evidence in making her RFC determination, including Hunt's complaints of subjective pain, Dr. Newman's April 8, 2008 report, and a February 7, 2008 "Report of Contact" from the Social Security Administration's files. (Pl.'s Br. 16.) Hunt further argues that, as a matter of law, ALJ Michaelson failed to comply with Social Security Ruling ("SSR") 96-8p, which requires an ALJ to assess the claimant's work-related abilities in the context of a "typical" work week. (*Id.*)

### 1. Hunt's Complaints of Subjective Pain

Hunt argues that ALJ Michaelson improperly disregarded his subjective complaints of pain in making her RFC determination. Hunt correctly notes that the applicable two-part analysis in assessing subjective pain is found in SSR 96-7p, with additional relevant factors set forth in 20 C.F.R. § 404.1529. The first prong of this analysis requires the ALJ to "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, 1996 WL 374186, at

*2. After satisfying the first prong, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* The ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, at *1. The ALJ must give "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2.

In this case, ALJ Michaelson acknowledged that the second step of this analysis required her to evaluate the intensity, persistence, and limiting effects of Hunt's pain and other symptoms after considering the objective medical evidence, Hunt's own statements about his functional limitations, and information provided by Hunt's treating or examining physicians. (9/8/2009 ALJ Decision; R. at 14.) ALJ Michaelson also correctly noted "[t]he claimant's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence. (*Id.* (citing SSR 96-7p).) ALJ Michaelson's conclusion regarding Hunt's limitations states:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity assessment.

(9/9/2009 ALJ Decision; R. at 15.)

For the most part, ALJ Michaelson accepted Hunt's complaints of subjective pain. ALJ Michaelson credited Hunt's testimony that he is able to lift up to 30 pounds, but that "he still suffers pain in his shoulder while performing activities involving the prolonged raising of his left arm" and "the pain that he feels in his left shoulder also shoots down to his elbow . . . as a 5 on a 10-point scale." (9/8/2009 ALJ Decision; R. at 14.) ALJ Michaelson also noted, however, that Hunt was able to treat this pain with over-the-counter Aleve and was "able to care for his personal needs with little difficulty." (*Id.*) This evaluation of the relevant factors is correct as a matter of law. *See* 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms . . . include: [y]our daily activities [. . . and] [t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms . . . .").) Moreover, the court disagrees with Hunt's assertion that ALJ Michaelson failed to credit his testimony that he is in constant pain. As Hunt stated at the March 31, 2009 hearing:

> . . . on a day like today, I feel like I have this 20 or 30 pound weight on my left shoulder, and I have pain around my shoulder blade that comes up and goes out to my elbow. I live with that. I accept that. It's like I say on a scale of one to ten it is about a five, and that is something I've come to deal with. It wakes me up in the middle of the night, and I'm aware of what is going on. I know at this particular point that is not going to change.

(3/31/2009 Hr'g Tr. at 50.) This testimony is not inconsistent with the ALJ's findings or her ultimate RFC classification. When asked about the limiting effects of his ongoing pain on his daily activities, Hunt noted only "[a]t this point I still have issues with it when I'm driving . . . . If I have to turn the steering wheel completely I get that shooting pain whereas I will have to stop what I'm doing and pull over." (3/31/2009 Hr'g Tr. at 51.) Hunt also testified, however, that he

drove to the hearing before the ALJ, and that his household responsibilities included driving his children and other neighborhood children to and from school.  (3/31/2009 Hr'g Tr. at 51, 53.) Based on this testimony, ALJ Michaelson reasonably concluded that Hunt's shoulder pain did not interfere with his ability to care for his personal needs.  Because ALJ Michaelson appropriately considered Hunt's complaints of subjective pain within the context of the entire case record, and because she largely accepted Hunt's complaints of subjective pain as credible, the court finds no reversible error on this point.

### 2.    Additional Evidence Supporting a "Sedentary" RFC Classification

Hunt also argues that ALJ Michaelson "disregarded clear evidence from Mr. Hunt's doctors and the SSA itself tending to show an RFC of 'sedentary' was appropriate."  (Pl.'s Brief 16.)  The court disagrees.

In support of his argument, Hunt cites a February 7, 2008 "Report of Contact" from the Social Security Administration's files.  (2/7/2008 Report of Contact; R. at 151.)  The Report of Contact states, in relevant part, "The current RFC of 02/04/08 indicates ability for sedentary work.  He is limited in his ability to reach overhead."  (*Id.*)  While ALJ Michaelson did not specifically reference the Report of Contact in her RFC analysis, she did consider Dr. Madala's underlying February 4, 2008 report.  As a procedural matter, ALJ Michaelson was entitled to do so.  *See* 20 C.F.R. § 405.325(a) ("The issues before the administrative law judge include all the issues raised by your claim, regardless of whether or not the issues may have already been decided in your favor.").  Dr. Madala's February 4, 2008 report did not indicate that Hunt was limited to sedentary work, as stated in the Report of Contact.  In fact, Dr. Madala opined that Hunt was capable of more activities than those ultimately included in ALJ Michaelson's RFC

assessment.  Specifically, ALJ Michaelson rejected Dr. Madala's conclusion that Hunt could

occasionally crawl and could occasionally reach overhead with his left arm.  The court finds no

error in ALJ Michaelson's consideration of this evidence.

Hunt further contends that ALJ Michaelson failed to "mention" the limitations noted by

Dr. Newman in his April 8, 2008 evaluation.  Dr. Newman's April 8, 2008 evaluation states that

Dr. Newman "advised [Hunt] to go back to work with the previously outlined restrictions and see

how he tolerates it."  (4/8/2008 Newman File Letter; R. at 210.)  Dr. Newman's previous

restrictions, considered by ALJ Michaelson in her RFC determination, limited Hunt to performing

only "light duty" work—not sedentary.  (*See* 9/9/2009 ALJ Decision; R. at 15.)  Hunt's argument

is therefore not persuasive on this point.

3.      Social Security Ruling 96-8p

Hunt further asserts that ALJ Michaelson "failed to determine what Mr. Hunt was capable

of in a typical work week," as required by SSR 96-8p.  (Pl.'s Br. 16.)  In the alternative, insofar as

ALJ Michaelson did make this determination, Hunt argues that it was unfounded, based on "a

dearth of information as to Mr. Hunt's ability to lift <u>any</u> weight or <u>reach</u> with any <u>frequency</u>."

(*Id.* at 17 (emphasis in original).)

SSR 96-8p states that, ordinarily, "RFC is an assessment of an individual's ability to do

sustained work-related physical and mental activities in a work setting on a regular and

continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an

equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at * 1.  Throughout her opinion, ALJ

Michaelson consistently referred to Hunt's ability to engage in work-related activities.  (*See, e.g.,*

9/8/2009 ALJ Decision; R. at 11 ("An individual's residual functional capacity is his ability to do

physical and mental work activities on a sustained basis despite limitations from his

impairments."); 16 ("although the claimant was limited by his shoulder impairment, it did not rise

to a level that prevented him from engaging in work activities altogether"); 17 ("the medical

expert testified that the claimant suffers from left shoulder pain that causes some work-related

limitations").)  ALJ Michaelson also stated that she had given "very significant weight" to the

ME's testimony that Hunt was capable of frequently lifting up to 10 pounds and occasionally

lifting up to 20 pounds using both arms, that Hunt should engage in "only occasional reaching

with his left arm in any direction," and that Hunt could "frequently work with his left arm directly

in front of him."  (9/8/2009 ALJ Decision; R. at 17.)  As noted by the Commissioner, "[t]he terms

'frequently' and 'occasionally' have specific meanings" with respect to Social Security

regulations, and it can be assumed that the ME knowingly employed these terms in his assessment

of Hunt's capabilities.  (Comm'r Br. at 10-11 (citing SSR 83-10, 1983 WL 31251, at *5-6

("'occasionally' means occurring from very little up to one-third of the time" and "'frequent'

means occurring from one-third to two-thirds of the time")).)  While the terms "frequently" and

"occasionally" do not themselves reference a regular work schedule, they provide an overall

assessment of the claimant's abilities *at all times*.  ALJ Michaelson's use of this terminology

suggests an appropriate focus on Hunt's ability to engage in sustained work-related activities.

After having also considered Dr. Newman's treatment notes, Dr. Madala's February 4, 2008

report, Dr. Patil's April 20, 2009 report, and the April 2008 work status discharge sheet, ALJ

Michaelson concluded, "There are numerous instances where it was remarked that the claimant

would be unable to return to his past work; however it is equally clear that the claimant's treating

sources did not view his impairment as one that would prevent him from performing all jobs,

regardless of the exertional level." (9/8/2009 ALJ Decision; R. at 18.)  The record includes

substantial evidence to support ALJ Michaelson's conclusion on this point, and the court finds no

error of law in ALJ Michaelson's assessment of Hunt's abilities to engage in sustained work-

related activities.

      C.        <u>Hunt's Ability to Perform Other Work in the National Economy</u>

Hunt next argues that "the ALJ's decision that work exists in the national economy also

was not supported by the substantial weight of the evidence." (Pl.'s Br. 17.)  Again, the court

disagrees.

First, Hunt argues that the February 7, 2008 "Report of Contact" constitutes a finding by

the Social Security Administration that "there were no jobs available for Mr. Hunt in 2008."

(Pl.'s Br. 17 (citing 2/7/2008 Report of Contact; R. at 151).)  This evidence, however, does not

weigh in favor of Hunt's argument.  The Report of Contact is based on an inapplicable

"sedentary" RFC assumption, as discussed above.  Moreover, and more important, the Report of

Contact concludes that "adequate employment opportunities exist within this range of work," thus

directly contradicting Hunt's assertion.  (2/7/2008 Report of Contact; R. at 151.)

Next, Hunt argues that "the VE testified repeatedly to contradictory numbers and seemed

confused as to the distinction between 'light' and 'sedentary.'" (Pl.'s Br. 17.)  Although the VE's

March 31, 2009 testimony required some explanation during the hearing, it was not internally

inconsistent.  The VE simply disagreed with the DOT's assessment that the "light duty"

information clerk position, with 8,000 available jobs, actually required frequent extended

reaching.  (*See* 3/31/2009 Hr'g Tr. (VE); R. at 75, 77-78, 83-86.)  As long as an ALJ "inquire[s]

into and resolve[s] apparent conflicts" between the VE's evidence and the DOT by "elicit[ing] a

reasonable explanation for any discrepancy," as ALJ Michaelson did at the March 31, 2009 hearing and in her September 8, 2009 decision, such testimony is not problematic. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). ALJ Michaelson reasonably credited the VE's "numerous years of professional experience," including his "observations of individuals performing such jobs," as explaining the discrepancy between the VE's testimony and the DOT's description. (9/8/2009 ALJ Decision; R. at 20.) This court will not disturb ALJ Michaelson's finding on this point.

Hunt also takes issue with the fact that the VE relied on job reports compiled in 2007, noting that "economic times were quite different in 2007." (Pl.'s Br. 17.) Hunt's attorney raised this issue at the March 31, 2009 hearing before ALJ Michaelson, and the VE conceded that his statistics were only current through 2007, in accordance with his usual practice of relying on job reports that were up-to-date within the last year. (3/31/2009 Hr'g Tr. (VE); R. at 87.) Although the VE testified that the numbers "usually [do not] change that much" from year to year, this court takes judicial notice of the significant decline in the national economy beginning in 2008. Nevertheless, with no suggestion that more reliable, current reports were available to the VE at the time of the hearing, and in light of the VE's testimony that there were 16,000 positions available to Hunt in the Chicago metropolitan area, this court finds that there is substantial evidence to uphold ALJ Michaelson's conclusion that there are a significant number of jobs available to Hunt in the national economy. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (citations omitted) ("As few as 174 jobs has been held to be significant, and it appears to be well-established that 1,000 jobs is a significant number.").

II.     ALJ Michaelson's Duty to Develop a Full and Fair Record

Finally, Hunt argues that ALJ Michaelson failed to develop a full and fair record. (Pl.'s Br. 18-19.) According to Hunt, ALJ Michaelson should have "obtain[ed] additional evaluations and experts" to assist in determining whether Hunt's RFC was properly categorized as "light" or "sedentary." (*Id.* at 19.) Specifically, Hunt asserts that there is a lack of evidence in the record regarding "the frequency with which Mr. Hunt can lift any amount with his left or right hand." (*Id.* at 18.)

An ALJ has a "basic obligation . . . to develop a full and fair record." *Smith v. HEW*, 587 F.2d 857, 860 (7th Cir. 1978). "If the ALJ believes that he lacks sufficient evidence to make a decision, he must adequately develop the record and, if necessary, obtain expert opinions." *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000); *see also Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) ("the procedure for adjudicating social security disability claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled."). If, however, the medical record includes substantial evidence sufficient to support the ALJ's findings, the ALJ need not pursue additional relevant evidence. *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999). "How much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment." *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993).

Hunt stresses that "[t]he ALJ has a duty to scrupulously and conscientiously probe into, inquire of and explore all relevant facts, especially when the claimant is unrepresented by counsel." (Pl.'s Br. 18 (citing *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981).) It is undisputed, however, that Hunt was represented by counsel throughout the hearing before ALJ

Michaelson, and that Hunt's counsel had the opportunity to question all witnesses for purposes of further developing the record on Hunt's behalf. The court therefore finds that *Cannon* is inapposite. More important, as discussed above, the record contains substantial evidence to support ALJ Michaelson's finding that Hunt qualified for a RFC of "light" work. Accordingly, ALJ Michaelson was under no obligation to obtain additional evaluations or retain additional experts for purposes of addressing this issue.

CONCLUSION

For the aforementioned reasons, Robert E. Hunt's motion for summary judgement (Dkt. No. 25) is denied, the Commissioner of Social Security's motion for summary judgment (Dkt. No. 34) is granted, and the Commissioner's final decision is affirmed.

ENTER:

*James F. Holderman*
_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: March 26, 2012